The next matter is Wren vs. Luzerne. Good morning, your honors. May it please the court, my name is Joe Joyce. I represent appellants, former Luzerne County Commissioner Mary Ann Petrilla and former Luzerne County Commissioner Steven Urban. I'd like to reserve five minutes for rebuttal, your honor. You want to get out of here, don't you? No, your honor. Today we're seeking a decision to reverse the decision of the district court denying the affirmative defense of qualified immunity to the appellants. Let me make sure that I'm right in my mind. This is a situation where the plaintiff came in and I'm not sure whether or not it's in his job promulgating policies for his department and no one challenged him on that. So these policies, I assume they're still there, but he started, maybe promulgating is not the right word, but he started drafting and creating policies. Yes, your honor. And he prepared the budget for them? Yes, your honor. Why isn't that the end of this? Maybe I should ask your opponent that question, but why isn't, why are we even here? Well, I would submit that the court bid on to the Boyle framework, wherein one of the decisions... Well, the court did go down to Boyle, but Boyle was not, that was strictly summary judgment and a kind of a strange procedure for determining facts in the context of a summary judgment motion, but there was no qualified immunity at issue there, and so the issue that we have to deal with is whether or not there was a reasonable belief in a clearly, in the violation of a clearly established right, and that's not there, and that's our concern here, and if we're talking about a policy-making position to get under the Branty Elrod exemption, if we're talking about someone who is a public official who's drafting policies or making policies, preparing budgets, again, it seems to me, why aren't we here? I agree. It's hard to... Do you want to rest on your brief? Is that what you're telling me? I mean, my colleagues might have questions, but if they don't, if you want to rest on your brief, I will... If there are no questions, I'll take the advice of Judge McHugh. Additional background, as your honors are aware, the plaintiff was the director of Veterans Affairs for Luzerne County. Why was that position not protected under Branty Elrod? Why was it... Why does it not afford First Amendment protection? I believe, and this is getting outside the clearly established framework, but I think Judge McHugh is right in that he did orchestrate the provision of veterans benefits. He did write up operating procedures. He did have a budget. He paid for the flags to be laid on the graves. He paid for the flags. He negotiated for the purchase of those flags. What do you mean he negotiated? Didn't he put some money down? I'm not sure that was a... He negotiated contracts on behalf of the county, is what I'm saying. He did some legal stuff, but he also did some policy stuff. Yes, I agree. Well, how much of it was administrative and how much of it was not administrative? Well, it's hard to parse that out. He did draft the operating procedures for the office. He did supervise the staff. He was responsible for the budget, but he also helped individuals apply for the benefits. So, I think you could split it that way. Sitting down with someone and, you know, filling out the appropriate forms in order to make them eligible to receive the benefits, I guess that would be administrative in nature. Didn't he say in Assaf v. Fields that you have to look to see whether the employee can cause serious political embarrassment? Yes, Your Honor. And how is that possible here? I think in this case he can. The body of constituency in Luzerne County of veterans is 36,000 veterans. You don't need 36,000 votes to be elected. He's going out into the community. He's going monthly to veterans organizations and talking about the programs that are offered. And, you know, those kind of things could be election issues for veterans, their spouses and their wife. And I think you can cause embarrassment to a county commissioner in that capacity. I don't know enough about county commissioners to know. What about the fact, though, that Commissioner Petrola testified that she didn't consider political affiliation as having anything to do with this particular job? Well, that was the Boyle decision. And that said, you know, if the decision-makers, and in there they had a majority saying that, and here we only have one of three, that that's probative of whether it's appropriate for the job. But it's not dispositive. It's just one more additional factor of the ever-expanding Branty Elrod factors. The posture of your case is in an unusual posture before us, at least my viewpoint. We have the jurisdictional question, which I think is a close question. It always is on these qualified immunity appeals, when there are factual underpinnings that may be in dispute. And here, in essence, what I see you appealing from is the legal question that the district court essentially said, almost the flip side of what the rule is. The district court essentially said, you know, it's not clearly established that Wren, or that the commissioners, in getting rid of Wren, were entitled to the Elrod Branty exception. That's essentially what the district court said. I think that's exactly right. And you're here saying we have jurisdiction to consider this. Yes, Your Honor. And we should flip that upside down and say, you know what, it was clearly established that Wren fell within the Elrod Branty exception. Isn't that what you're saying? Or at least that it was not clearly established that he had First Amendment protection. Whether it's reasonable for them to believe that. Yes, Your Honor. Okay, that's the other side. I think we're on the legal issue of only clearly established. And all these collateral facts that may go to whether he had a First Amendment protected right is more to the first prong, whether his constitutional rights were violated. Whereas, I'm focusing in this appeal on whether those rights were clearly established. Okay, on one hand, if this is the legal scale, on one hand we could go with the district court. On the other hand, we could go with your interpretation of it on behalf of the commissioners. But in the middle we could say, you know what, there are too many facts here. And that can't be determined as a question of law. And that was the first part of the district court's determination. And if that's the case, we can send this thing back. We either affirm in the district court or by saying we don't have jurisdiction to consider it. I respectfully disagree that the issue of whether it's clearly established would go to the body of case law that's available. But don't some of the facts that are unanswered here factor in to our determination?  You don't think so? I think he's a public employee. He's the Director of Veterans Affairs. And by statute and by the record, he orchestrated the provision of veterans' benefits. All of, I think that alone. When you say orchestrated the provision, what does that mean? What did he do? I'm stealing that phrase from Judge Sloviter in the Wascovich opinion. But, for instance, you're a veteran and you were injured. You would come to his office. He would sit down with you. He would help you fill out the forms. He would present your case to the Veterans Department. Well, that doesn't sound like a policymaking position to me. I agree that that end of it would be more administrative. But the Wascovich opinion that Judge Sloviter authored cites cases from out of the circuit. In that decision, she stated that there's very few cases that address this issue. I didn't talk for myself. The court stated. I'm sorry. The court stated there's very few decisions that deal with whether this is a policymaking position or not. And there was two cases cited. The Pounds case was out of the Seventh Circuit. And it was also a county-level employee. It was a VSO, a veteran services officer, who did only that. You would come in. He would help you try to obtain the benefits that you thought you were entitled to. The court there found that Brandy Elrod did not protect that position, that that was a policymaking position. The next case was Savage out of the Second Circuit, also a county-level employee who orchestrated the provision of veteran benefits. And the Second Circuit found that that position was also at the policymaking end of the county government spectrum. And then you get to the actual facts of Wascovich, which was a state-level position where he managed cemeteries and nursing homes. But I think that's the body of case law that we have to look at to see is it clearly established. Whether or not his rights were ultimately violated, and I agree that those facts are going to be key in that determination, is a separate issue. And what I think the Supreme Court did in Pearson was say, we can look at the clearly established prong without having to look at whether there was a constitutional violation, especially in the case as here where it's very fact-specific, where it's very fact-intensive. But when you start talking about very fact-intensive, then you go back to Judge Fischer's concern about being here at this procedural position. It seems to me that if you have pounds on the one hand and boil on the other, it's hard to say that it's clearly established just given the conflict in those two. And then you have our opinion of Wascovich, which would certainly suggest that political consideration would be appropriate. I don't think the issue is, is it clearly established that you can terminate him? Is it clearly established that he has a First Amendment protector right in his job? That's right. That's what I meant. Right. That's right. I think that's the analysis. You know, and they use words like, it's got to be apparent. It's got to be beyond debate. I think that's what the Supreme Court is referencing. Okay. We saved a lot of time for rebuttal. So why don't we hear from Mr. Boling? May it please the Court. I'm Kimberly Boling. I'm here on behalf of Richard Wren. I think the significance of Boyle is in establishing, which of course came after Wascovich, in establishing what was indeed clearly established. It's not that Boyle was a summary judgment decision, which it was. It's that it was the statement of the law in this circuit about what would be a position for which political affiliation could be an appropriate qualification. The key, as far as Boyle is concerned, is that in our case, we have the Majority Commissioner, Mary Ann Petrilla, who states that she did not believe that this was a position which was appropriate for political affiliation. Yeah, but Urban doesn't state that. I should have started with DeLuca, who is the point I was about to make. The point I was about to make is that the county solicitor, Mr. DeLuca, not only says that it was not an appropriate position for political affiliation, but he also says that it is a matter of law, a matter of policy, and a matter of law. It was understood by the county solicitor who advised the county commissioners that that was the state of the law, that it was indeed clearly established at that point. Now, Judge McKee, your questions about what the particular role was that Mr. Wren played is an appropriate question, certainly at the summary judgment level. Judge Conaboy found, and there's plenary review of that at some point, but at this point, for purposes of what was understood by a reasonable county commissioner, is that there was a dispute of the facts. The material facts are in dispute. But what's not really in dispute is one of the points that Judge Conaboy made in his opinion, which is that the statute in Wascovich, the New Jersey statute, provided entirely different requirements for that statewide position, in which Mr. Wascovich was tasked with the duties to supervise, operate, and establish those veterans programs, while the Pennsylvania statute, for the purposes of the county White Office of the Director of Veterans Affairs, was to assist, simply to assist. Now, if he's promulgating it, and that's not the right word. It's the word that keeps coming out. If he's making policies, often to his office, and preparing budgets, doesn't that move down the Wascovich road? I don't believe so, Your Honor. I think by saying, but those are fairly conclusory terms, both establishing policies and making budgets.  He simply provided to the county what he believed the appropriate expenditures ought to be in the coming year. But he had no authority to make budgets, any more than anyone else who was employed in the county, and submitted those kinds of requests across the board. There isn't any authority that says that by submitting proposed budgets, it makes you a policymaker. The policies that are referenced in the record relate to internal operating policies for that particular office, not for countywide veterans policies. You say policies, but you're talking about time checking in, time checking out. Those kinds of things, yes. And we detail at page 16 of our brief the differences between Wascovich and Mr. Wren. Mr. Wascovich, a statewide position, 20 years ago paid $64,000 a year, oversaw 1,000 employees. Mr. Wren was paid two-thirds of that. He supervised three employees. In Wascovich, it was acknowledged in a summary judgment stage that Mr. Wascovich participated in numerous staff meetings on a departmental and divisional level, was involved in policy matters on a day-to-day basis, and the supervisors asked for his views on major policy proposals such as capital improvement programs. To the contrary with Mr. Wren, he engaged in no cabinet-type discussions, no group discussions with the county commissioners on issues of policy. He rarely worked with the county commissioners. He had no day-to-day specific contact with individual members of the board of commissioners with respect to setting policies. His successor testified he hadn't been asked to establish any policies himself in Mr. Wren's place. So the point of that is not, again, to argue the summary judgment motion as to the county. The point is that the county officials were aware, they were seeking qualified immunity, were aware of the factual context of what Mr. Wren's position was, keeping in mind that the burden to establish the entitlement to this qualified immunity remains on those seeking it, on commissioners Petrola and Urban, that it's a fact-based inquiry according to the Zoll decision. It is a fact-based inquiry. In other words, it can't be determined, well, it's a matter of law. The matter of law turns on what the facts are detailing the particular contours of the positions that are in question. And those facts, you know, Judge Conaboy identified, one, that both Commissioner Petrola and the solicitor for the county had believed that this was not a position appropriate for political affiliation, and two, that Solicitor DeLuca stated that that was a matter of law, and three, with regard to the issues of the statutory duties that have been imposed upon both Mr. Wren by comparison to Mr. Wascovich, a different statute provided for different requirements and different obligations in terms of whether they could be comparable. Four, pointed out that the facts that were laid out were in dispute as to the specific duties that he had. And since it's a fact-based inquiry under Zold, that wasn't an appropriate determination. The remaining questions that relate to that, after those inquiries are made, are what were the reasonable person in the context of the person seeking the qualified immunity, what should they have known? And clearly the advice from their solicitor, Mr. DeLuca, was available to them that this was a clearly established principle as to this position, and Commissioner Petrola herself conceded that. So those are the responses that I would make to the positions taken by Mr. Joyce on behalf of his clients. Okay, thank you, Mr. Boylan. Thank you. Your Honor, once again, I would point out that the factual inquiry as to whether his First Amendment rights were violated is separate and apart from whether he had those rights in the first instance, and whether those rights were clearly established by the similar factual precedent that was inexistent at the time. I don't understand that, but if there's a factual dispute as to what his actual duties were, then there is a jurisdictional issue here. What about what Mr. Boylan just said about his duties? I've been focusing on his policy, but Mr. Boylan was saying, yeah, he generated policies, but they're basically things like dress code for his own office, the few people that he supervised, the kinds of things that a manager of a very small position, an administrative totem, if you will, has discretion, those kinds of rules that a boss can lay down to the people that report to him or her. Those are the kinds of policies we're talking about here. Are you saying there's something broader than that? When he took office, there were no procedures. Procedures for what? For anything. When he took office, it was essentially a blank slate. So he began what he referred to as shop operating procedures. He devised a way on how everyone would operate and carry out their functions. Were some mundane? Perhaps. Others were not. They're the operation of the office, the submission of budgets, things of that weight. But once again, I think that's a path we don't need to necessarily go down when it's firmly established that his main functions were to make sure the constituents, those who were eligible to get benefits, were given the benefits. When we look at the case law that was out there, it's very analogous. We have the Seventh Circuit, the Second Circuit cases, where there are probably employees that would be below Mr. Wren at Luzerne County, and they're found to be policymakers. So whether we have to go through the analysis to find out whether or not there was a constitutional violation, I think it's separate and apart from what case law was out there and what would the commissioners think. If I read Pounds or Savage, I don't think there's any question that he would fall within the Brandi Elrod exception. And I think that the court even struggling with the first analysis and saying that it's a close call reflects that it's not clearly established that Mr. Wren enjoyed First Amendment protection in his position. So I agree that if that were the issue, that you wouldn't have appellate jurisdiction. That's a fact question. But whether it's clearly established, that is a legal question. And the court has, there is some factual underpinning to it, and the analysis the court made was like double jeopardy. We got to look at two indictments. So there's a close, it's called a factual legal analysis. That's what the case law refers it to. But it's a legal determination. Judge Fischer, I think has a question. I guess it's sort of the same conflict that I pointed out before. It seems to me for us to determine that it wasn't clearly established as to what the law was to support your client's plural position, you have to look at the facts. I think very superficially. But you have to look at them. And if you have to look at them, that leads to one of two conclusions. One, we don't have jurisdiction. Or two, it should go to the jury, which is what the district court decided. I would respectfully argue the opposite. I think the Mitchell case is exactly your point. The clearly established is a matter of law. Is there a superficial fact element to it? Yes. And they recognize that. In fact, they've granted that in situations where they acknowledge that whether there's a constitutional violation is so fact intensive that we're not even going to do that part of the analysis. Because it really doesn't help develop our constitutional law because it's so fact dependent that it's really no good to anybody except for the plaintiff. So I understand your point, but I think the case law is clear. When you conceded a few minutes ago that you have to look at the facts very superficially, I assume the facts you're talking about looking at superficially are not those facts which go to establishing a principle, a legal principle, but those facts which go to determine what exactly did the plaintiff do, what were his duties and what did they amount to may well be an issue overall. First you have to find out what the heck he did. Well, when I say that, it's because I just lost my train of thought. Because you didn't think where that answer was going to take you. It's because you didn't think where that answer was going to take you. Because in saying yes, you may well give rise to the kind of factual inquiry, not factual, i.e., conclusion of wrong under Elrod. What I said that was because we're instructed to look at factually analogous case law. No, you're getting facts. You want to get the factual inquiry into the legal bucket, and I understand why you want to get us there, because then you get into a question of law and that helps you. But I'm talking about a factual inquiry in the factual bucket. What exactly did he do? And if there's dispute around that, that's a very different kind of fact than a fact about what those duties amount to. I don't think we need to get there. Part of the clearly established analysis is looking at factually similar precedent. So if we're looking at factually similar precedent, we're looking at positions. But we have to first find out what. . . We can't look at factually similar precedent until we find out what the facts are of this case, and then we can confirm to the precedent. Those facts that just establish what his main job duties are, what his job is, they're not in dispute. I thought you said a few minutes ago that there were some. . . Whether he would qualify as a policymaker under Brandy Elrod, those facts. . . No, I understand that's a different kind of fact. But if you're looking at the case law that's out there, if you're looking at Pounds, if you're looking at Savage, all you need to know is what he did. And those facts aren't in dispute, and that's a legal issue. Okay, thank you very much, Mr. . . .